EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:05CR12 |
| | ) | |
| v. | ) | Count 1: Conspiracy |
| | ) | (18 U.S.C. Section 371) |
| 1) CHRISTOPHER J. BENYO, | ) | |
| 2) CHARLES E. JOHNSON, JR. | ) | Counts 2-3: Securities Fraud |
| 3) JOSEPH MICHAEL KENNEDY, | ) | (15 U.S.C. Sections 78j(b) and 78ff; Title 17 |
| 4) JOHN P. TULI, | ) | C.F.R. Sections 240.10b-5) |
| 5) KENT D. WAKEFORD, and | ) | |
| 6) SCOTT E. WIEGAND, | ) | Counts 4-5: False Statements to Auditors |
| | ) | (15 U.S.C. Sections 78m(b)(1) and 78ff; |
| Defendants. | ) | Title 17 C.F.R. Section 240.13b2-2) |

Counts 6-27: Wire Fraud
(18 U.S.C. Sections 1343 and 1346)

Count 28: Obstruction
(18 U.S.C. Section 1512)

Counts 29-31: False Statements
(18 U.S.C. Section 1001)

Forfeiture Notice
(18 U.S.C. Section 981)

Sentencing Factors
(18 U.S.C. Sections 3551 *et seq.*)

January 2005 Term – Alexandria

**INDICTMENT**

1

**Exhibit 6**

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment:

## INTRODUCTORY ALLEGATIONS

**I.    RELEVANT PERSONS AND ENTITIES**

    **A.    PurchasePro.com**

1.    PurchasePro.com, Inc. ("PurchasePro") was a Nevada corporation headquartered in Las Vegas, Nevada. Among other things, PurchasePro engaged in the sale of Internet procurement software and services, including "marketplace licenses" designed to enable cost-efficient business-to-business or "B2B" transactions over the Internet.

2.    PurchasePro was an Internet "start-up" company that became publicly owned in or about September 1999 after PurchasePro conducted its initial public offering. PurchasePro's shares traded on the National Market of the National Association of Securities Dealers Automated Quotations System ("NASDAQ") and were purchased and sold by individuals and entities throughout the United States, including in the Eastern District of Virginia. As of December 2000, PurchasePro had a total market capitalization that exceeded $1.2 billion based on the number and value of publicly traded stock shares.

3.    On or about September 12, 2002, PurchasePro filed for federal bankruptcy protection.

    **B.    AOL and Time Warner**

4.    Prior to January 11, 2001, America Online, Inc. ("AOL") was a Delaware corporation headquartered in Dulles, Virginia in the Eastern District of Virginia. Among other things, AOL engaged in the sale of Internet subscriptions and advertising and provided interactive services, web brands, Internet technologies, and electronic commerce services.

5.    Time Warner Inc., ("Time Warner") was a Delaware corporation based in New York, New York. Among other things, Time Warner engaged in the sale of broadcast and print media products.

2

6.    On or about January 11, 2001, AOL and Time Warner merged and began operating under the name AOL Time Warner Inc. Following the merger, AOL continued operating as a separate division and wholly owned subsidiary of the combined company.

7.    Prior to the merger in January 2001, the common stocks of both Time Warner and AOL were publicly traded on the New York Stock Exchange. After the merger, the common stock of Time Warner continued to be publicly traded on the New York Stock Exchange, and was bought and sold by individuals and entities throughout the United States, including in the Eastern District of Virginia. Except where otherwise noted, "AOL" refers herein to both AOL and AOL Time Warner.

8.    On or about September 13, 2000, AOL launched its Netscape NetBusiness platform ("NetBusiness"), which was designed to be an Internet site dedicated to providing interactive services to the small business community.

**C.    PurchasePro Defendants**

9.    Defendant CHARLES E. JOHNSON, JR. (also known as "JUNIOR" JOHNSON) was Chief Executive Officer and Chairman of the Board of Directors at PurchasePro. As Chief Executive Officer, JOHNSON was responsible for all aspects of corporate management at PurchasePro. JOHNSON took personal control of PurchasePro's relationship with AOL.

10.    Defendant CHRISTOPHER J. BENYO was Senior Vice President of Marketing at PurchasePro. Among other responsibilities, BENYO managed the development of PurchasePro's products. BENYO was a member of the senior management team that was updated, informed and consulted about revenue recognition.

11.    Defendant JOSEPH MICHAEL KENNEDY was Senior Vice President and Chief Technology Officer at PurchasePro. Among other responsibilities, KENNEDY managed PurchasePro's information technologies, a significant business area at an Internet company like PurchasePro.

12.    Defendant SCOTT E. WIEGAND was Senior Vice President and General Counsel at PurchasePro. Among other responsibilities, WIEGAND managed important internal

3

controls at PurchasePro, including approval authority for all PurchasePro contracts, and was one of three senior officers responsible for interacting and communicating with PurchasePro's outside auditors. WIEGAND was a member of the senior management team that was updated, informed and consulted about revenue recognition.

13.    As PurchasePro employees, defendants JOHNSON, BENYO, KENNEDY and WIEGAND each owed a duty to PurchasePro and its shareholders to provide the company with their honest services. Each of the PurchasePro defendants received compensation in the form of salary, bonuses, stock options and other benefits.

### D.    AOL Defendants

14.    Defendant KENT D. WAKEFORD was an Executive Director in Business Affairs at AOL. WAKEFORD worked in AOL's offices in New York, New York. Among other responsibilities, WAKEFORD took day-to-day responsibility for AOL's relationship with PurchasePro.

15.    Defendant JOHN P. TULI was a Vice President in the NetBusiness unit at AOL. TULI was based in AOL's office in Dulles, Virginia. Among other responsibilities, TULI managed the development of the NetBusiness platform of which PurchasePro's marketplace software was a key component.

16.    As AOL employees, WAKEFORD and TULI each owed a duty to AOL and its shareholders to provide the company with their honest services. WAKEFORD and TULI each received compensation in the form of salary, bonuses, stock options and other benefits.

### E.    Additional Co-conspirators

17.    Co-conspirator Jeffrey R. Anderson was Senior Vice President of Sales and Strategic Development at PurchasePro.

18.    Co-conspirator Dale L. Boeth was Senior Vice President of Strategic Development at PurchasePro.

19.    Co-conspirator Robert Geoffrey Layne was Executive Vice President and "co-founder" at PurchasePro.

4

20.    Co-conspirator Shawn P. McGhee was President and Chief Operating Officer at PurchasePro beginning on or about December 2000.

21.    Co-conspirator Scott H. Miller was Senior Vice President of Finance at PurchasePro.

22.    Co-conspirator James S. Sholeff was Vice President at PurchasePro.

23.    Other co-conspirators are known and unknown to the Grand Jury.

## II.    THE FEDERAL SECURITIES LAWS AND SEC RULES AND REGULATIONS

24.    The Federal securities laws and the rules and regulations of the United States Securities and Exchange Commission ("SEC") were designed to ensure that the financial information of publicly traded companies is accurately recorded and disclosed to the investing public.

25.    As a public company, PurchasePro and its officers and employees were required to comply with SEC rules and regulations. Those regulations protect members of the investing public by, among other things, requiring that a company's financial information is accurately recorded, reviewed by independent auditors and disclosed to the public. PurchasePro disclosed its financial information to the public and the SEC through various means, including public statements, quarterly conference calls with analysts and investors, and the electronic filing of quarterly reports on SEC Form 10-Q with the EDGAR Management Office of Information and Technology in Alexandria, Virginia in the Eastern District of Virginia.

26.    Under the federal securities laws and SEC rules and regulations, PurchasePro was required, among other things: (a) to make and keep books, records, and accounts that accurately and fairly reflected the company's business transactions; (b) to devise and maintain a system of internal accounting controls that provided reasonable assurances that the company's financial transactions were recorded in a manner that would permit the preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP"); and (c) to file with the Securities and Exchange Commission ("SEC") and disseminate to the investing public quarterly reports (known as SEC Form 10-Q) and other periodic reports that included accurate and reliable

5

financial statements prepared in accordance with GAAP.  In addition, PurchasePro developed, and purported to follow, its own revenue recognition policy that mirrored the requirements of GAAP in all pertinent respects.

27.     PurchasePro also was required to and did retain outside auditors to review, audit and test its financial statements for compliance with appropriate accounting rules.  PurchasePro retained the public accounting firm of Arthur Andersen LLP ("Arthur Andersen") as its outside auditors.

28.     Four elements had to be satisfied for PurchasePro to recognize revenue from the sale of a marketplace license.  First, there had to be a written, signed contract prior to the end of the quarter.  Second, the sale price had to be fixed and determinable, that is, there could not be a future deliverable.  Third, the delivery of the product had to occur within that same period.  And fourth, collection of payment had to be reasonably assured, that is, the customer had to be credit-worthy.  If one or more of these elements was not satisfied, revenue would not be recognized or would be deferred until such time as all four elements were satisfied.

29.     The conspirators knew that Arthur Andersen would not allow revenue to be recognized if a contract was not signed and dated in the quarter, if there was a secret side deal creating a future commitment, concession or obligation or if the customer could not pay for the product.

III.     AOL AND PURCHASEPRO FORM A STRATEGIC PARTNERSHIP

30.     In or about March 2000, AOL and PurchasePro formed a strategic partnership designed to develop a business-to-business ("B2B") Internet marketplace and to generate significant revenues for both companies.

31.     The conspirators believed and understood that as an Internet start-up company, quarterly revenue was a key factor in determining PurchasePro's success and the price of its stock.  The conspirators also knew and understood that revenue was a primary factor on which analysts and investors relied in evaluating the company and making investment decisions.

6

32.    The strategic partnership was memorialized in three different agreements: the Interactive Marketing Agreement ("IMA"), the Technology Development Agreement ("TDA"), and the Warrant Agreement. These agreements obligated PurchasePro to pay AOL a total of $70 million in cash, to issue AOL warrants, which would allow AOL to buy PurchasePro stock in the future at a fixed, split-adjusted price of $63.25 per share, and to allow AOL to receive up to three million additional warrants ("performance warrants") for helping PurchasePro meet certain revenue objectives.

33.    By September 2000, the strategic partnership had failed to generate any revenues for PurchasePro or performance warrants for AOL. Therefore, in or about the last week of September 2000, AOL agreed to give PurchasePro $2 million in revenue by buying ten re-seller marketplace licenses from PurchasePro that AOL did not intend to use or resell.

34.    Subsequently, on or about November 18, 2000, JOHNSON, WAKEFORD and others amended the Warrant Agreement ("Amended Warrant Agreement") to allow AOL to earn up to $30 million worth of warrants in the fourth quarter of 2000, $45 million worth of warrants for the first quarter of 2001 and $60 million worth of warrants for the second quarter of 2001. The Amended Warrant Agreement also:

a.    removed the revenue thresholds necessary for AOL to earn the performance warrants;

b.    created a revenue multiplier that gave AOL $3 worth of warrants for each $1 of revenue AOL referred to PurchasePro; and

c.    reduced the exercise price from $63.25 per share to one penny per share.

35.    JOHNSON, WAKEFORD and others then agreed in or about November 2000, that AOL would purchase approximately $10 million of products directly from PurchasePro and would receive $30 million worth of warrants for the fourth quarter of 2000, which was the maximum allowed under the Amended Warrant Agreement.

36.    Most of the $10 million that was to go to PurchasePro was via a series of new contracts, including:

7

a.    On or about December 21, 2000, AOL purchased five more re-seller marketplace licenses from PurchasePro for $4.6 million, which, like the ten it purchased in September 2000, it did not need and which it intended to give away; and

b.    On or about December 28, 2000, AOL executed a contract giving PurchasePro approximately $4.9 million for subscriptions for AOL's NetBusiness customers for the month of December.

IV.    PURCHASEPRO'S PUBLIC STATEMENTS AND FILINGS

37.    On or about February 4, 2001, in a response to a critical February *Barrons'* article, JOHNSON publicly stated that PurchasePro's financial statements were prepared in accordance with GAAP and that PurchasePro had no "handshake deals."

38.    On or about February 12, 2001, JOHNSON, WIEGAND, BENYO and others publicly announced on PurchasePro's earnings conference call with analysts and investors that PurchasePro was "raising current consensus revenue estimates for the first quarter 20 percent to more than $42 million."

39.    On or about March 7, 2001, despite the fact that PurchasePro had not made any first quarter marketplace license sales, JOHNSON caused PurchasePro to issue a press release reiterating that revenues were on track to achieve first quarter projections of more than $42 million.

40.    On or about April 26, 2001, JOHNSON, WIEGAND, BENYO and others publicly announced on PurchasePro's earnings conference call that PurchasePro had generated approximately $29.8 million in first quarter revenue.

41.    On May 29, 2001, PurchasePro filed its quarterly report on Form 10-Q for the quarterly period ending March 31, 2001, reporting quarterly revenues totaling approximately $16.02 million.  The Form 10-Q was filed electronically with the EDGAR Management Office of Information and Technology, in Alexandria, Virginia in the Eastern District of Virginia.

8

# COUNT 1

## (Conspiracy – ALL DEFENDANTS)

THE GRAND JURY FURTHER CHARGES THAT:

I.    **THE CONSPIRACY**

1.    The allegations in paragraphs one through forty-one in the Introductory Allegations section are realleged as if fully set forth herein.

2.    From in or about September 2000 through in or about December 2003, both dates being approximate and inclusive, within the Eastern District of Virginia and elsewhere, the defendants BENYO, JOHNSON, KENNEDY, TULI, WAKEFORD and WIEGAND and others known and unknown to the Grand Jury, unlawfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, namely:

a.    directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, (1) to use and employ devices, schemes and artifices to defraud; (2) to make untrue statements of material fact and omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) to engage in acts, practices and courses of business which operated and would operate as a fraud and deceit in connection with the purchase and sale of PurchasePro stock, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5;

b.    to make and cause to be made materially false statements in PurchasePro's quarterly reports filed with the SEC, in violation of Title 15, United States Code, Sections 78m(a) and 78ff; and Title 17, Code of Federal Regulations, Sections 240.12b-20, 240.13a-13 and 240.13b2-2;

c.    to maintain and cause to be maintained false books and records of PurchasePro, in violation of Title 15, United States Code, Sections 78m(b)(2)(A) and (B), 78m(b)(5), and 78ff; and Title 17, Code of Federal Regulations, Section 240.13b.2-1;

d.     to make and intend to make materially false statements to accountants and auditors of PurchasePro, and conceal material facts from accountants and auditors of PurchasePro, in violation of Title 15, United States Code, Sections 78m(a), 78m(b), and 78ff; and Title 17, Code of Federal Regulations, Section 240.13b2-2; and

e.     to devise and intend to devise a scheme and artifice to defraud PurchasePro and its shareholders, including to deprive them of the intangible right to honest services of its employees, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Sections 1343 and 1346.

## II.    THE PURPOSES OF THE CONSPIRACY

3.     Among the purposes of the conspiracy were to:

a.     conceal the true financial condition of PurchasePro by falsely and fraudulently increasing the revenue reported by PurchasePro to its shareholders, the investing public and the SEC, for the benefit of the conspirators;

b.     conceal the true financial condition of PurchasePro and make it appear to be a successful business-to-business Internet company with increasing revenues;

c.     falsely and fraudulently increase and maintain the share price of PurchasePro stock; and

d.     falsely and fraudulently increase the revenue generated for AOL by its Business Affairs and Interactive Marketing units.

## III.   THE MANNER AND MEANS OF THE CONSPIRACY

Defendants BENYO, JOHNSON, KENNEDY, TULI, WAKEFORD and WIEGAND and their co-conspirators employed various manner and means in furtherance of conspiracy and scheme to defraud, including, but not limited to, the following:

4.    The conspirators, including BENYO, JOHNSON, KENNEDY, TULI, WAKEFORD and WIEGAND, entered into various transactions and arrangements and used various devices to inflate falsely and fraudulently PurchasePro's publicly announced and reported revenue during the period of the conspiracy.

5.    The devices the conspirators used and attempted to use included:

   a.    using secret, undisclosed side deals;

   b.    forging contracts;

   c.    booking revenue after the quarter closed by using back-dated contracts;

   d.    engaging in revenue swaps based on transactions solely designed to inflate revenue;

   e.    making false and misleading statements to financial personnel and internal and external auditors;

   f.    making false and fraudulent entries in PurchasePro's and AOL's books and records; and

   g.    engaging in related transactions where the link between the transactions was not disclosed.

6.    The conspirators made and caused others to make false and fraudulent entries to PurchasePro's books and records, including accounting records, correspondence, contracts, e-mails and other records used to support and document revenue.

7.    The conspirators made and caused others to make false and fraudulent entries to AOL's books and records, including accounting records, correspondence, contracts, e-mails and other records used to support and document revenue.

8.    The conspirators provided, and caused others to provide, false and misleading information to PurchasePro's outside auditors, by among other things:

   a.    giving the auditors altered and back-dated contracts;

   b.    withholding from the auditors important information, including the terms of secret side deals and oral agreements;

11

  c. making numerous affirmative misstatements of fact in documents prepared for the auditors;

  d. failing to maintain accurate documents regarding the signing and completion of contracts and sales agreements; and

  e. causing AOL to make false confirmations to PurchasePro's auditors.

9. The conspirators made and caused others to make materially false and misleading public statements about PurchasePro's anticipated revenue and financial performance for upcoming reporting periods knowing that there was a revenue shortfall and that various schemes and devices were used fraudulently to inflate revenue.

10. The conspirators made and caused others to make press releases, public statements and SEC filings about PurchasePro's financial performance based on fraudulently recorded revenue.

11. The conspirators and others undertook efforts to conceal their actions, including:

  a. deleting, attempting to delete, and causing others to delete e-mails;

  b. destroying and causing others to destroy records and documents;

  c. creating false and inaccurate documents and e-mails; and

  d. providing and causing others to provide false and fraudulent testimony and statements to the SEC and the Federal Bureau of Investigation (FBI).

**A.** **Fraudulent Devices Used to Inflate PurchasePro's Revenue**

12. In the first quarter of 2001, JOHNSON, WAKEFORD and others planned to inflate revenue by swapping approximately $45 million in total revenue between PurchasePro and AOL.

13. On or about March 15, 2001, JOHNSON flew to New York, New York to spend the last few weeks of the first quarter and the first week of April 2001 working in AOL's offices with WAKEFORD and others and attempting to sell marketplace licenses to AOL's customers and partners.

14.    When they could not sell the marketplace licenses, JOHNSON, WAKEFORD,
TULI, BENYO and others made and caused others to make side deals, undocumented guarantees
and oral promises to assure purchasers that they would not suffer financially by making a
marketplace license purchase from PurchasePro.

15.    The side deals included promises by:

a.    AOL to reduce future payments that the marketplace license purchaser
was contractually obligated to pay AOL;

b.    AOL and PurchasePro to provide a specified dollar value worth of on-line
advertisements or carriage on AOL's Internet properties;

c.    AOL to buy more products from suppliers who purchased a marketplace
license and to buy those products at a higher price; and

d.    PurchasePro to buy goods or services from the marketplace license
purchasers in the future.

These side deals were negotiated and agreed to as part of the marketplace license
purchases, but were not recorded in the marketplace license contract documentation and were not
fully disclosed to PurchasePro's outside auditors and the investing public.

16.    During the final weeks of March 2001 and the first week of April 2001,
JOHNSON, WAKEFORD, TULI and others made and caused others to make side deals that
resulted in marketplace license sales to the following AOL customers and partners:  Bigstep,
China.com, Cisco, Future Media, Hewlett-Packard, Homestore, Information Markets,
InsureZone, Monster, Spherion, Travelocity, Viva Magnetics and Yellowbrix.  These
marketplace license sales were included in the quarterly revenue numbers PurchasePro submitted
to its auditors and reported to the Board of Directors, but the secret side deals, undocumented
guarantees and oral promises were not disclosed to PurchasePro's auditors, the investing public
and the Board of Directors.

17.    During the final weeks of March 2001 and the first week of April 2001,
JOHNSON, WIEGAND, KENNEDY and others made and caused others to make side deals that

13

resulted in marketplace license sales to the following PurchasePro customers: Garg Data and Networks Unlimited A.G. ("NUAG"). These marketplace license sales were included in the quarterly revenue numbers PurchasePro submitted to its auditors and reported to the Board of Directors, but the side deals, undocumented guarantees and oral promises were not disclosed to PurchasePro's auditors, the investing public and the Board of Directors.

18.     During the final weeks of March 2001 and the first week of April 2001, JOHNSON, WAKEFORD, BENYO and others offered and caused others to offer secret side deals to Office Depot, Citibank and other major partners of AOL in an effort to induce these AOL partners to buy PurchasePro products and to inflate PurchasePro's revenue.

19.     As of the close of the first quarter of 2001, PurchasePro was well short of meeting the $42 million revenue estimate that had been announced publicly. JOHNSON, WAKEFORD, WIEGAND, TULI, KENNEDY and BENYO and others then created fraudulent arrangements and documentation to inflate artificially PurchasePro's first quarter revenue, including:

a.     attempting to sell additional marketplace licenses after the March 31, 2001 close for inclusion in the first quarter. The conspirators described this as keeping the quarter open;

b.     fraudulently providing PurchasePro with $9 million in revenue through an amendment to the Bulk Subscription Sales Agreement executed after the close of the first quarter but dated as of March 31, 2001; and

c.     creating a fraudulent Statement of Work that would require AOL to pay approximately $3.65 million to PurchasePro for technical integration work that was not completed by PurchasePro in the first quarter.

20.     As of part of this arrangement to inflate PurchasePro's first quarter revenue, AOL was to receive benefits from PurchasePro, including the following:

a.     approximately $12.2 million for commissions in the first quarter that AOL had not fully earned;

b.       approximately $7.7 million worth of warrants for a referral AOL did not

make; and

c.       approximately $5 million for television advertising on CNN and other

AOL media that PurchasePro did not want.

### Keeping the Quarter Open

21.     On or about March 31, 2001, JOHNSON delivered to WAKEFORD a

handwritten $12.2 million check as payment for commissions allegedly earned by AOL from the

first quarter 2001 marketplace license sales campaign.  In fact, JOHNSON, WAKEFORD and

others knew that AOL had not earned the full $12.2 million in commissions by the close of the

first quarter, but had earned only about $6.7 million in commission and much of that was from

marketplace licenses sold only by means of undocumented and undisclosed side deals.

JOHNSON, WAKEFORD and others planned on selling enough additional marketplace licenses

while keeping the quarter open in the first week of April 2001 to justify, after the fact, the full

$12.2 million in commissions.

22.     While keeping the quarter open during the first week of April 2001, JOHNSON,

WAKEFORD and others negotiated and attempted to negotiate marketplace license sales with at

least four companies, including 1800-Flowers, Proxicom, Monster and China.com, for inclusion

as first quarter sales.

23.     In order to disguise these efforts to sell marketplace licenses after the close of the

quarter, JOHNSON, WAKEFORD and others assisted in back-dating the contracts and facsimile

headers to make it appear that the contracts were signed by the close of the first quarter of 2001.

These efforts resulted in at least two additional marketplace license sales after March 31, 2001,

with a total value of approximately $6.7 million, being recorded by PurchasePro as revenues in

the first quarter of 2001.

24.     Between on or about April 19, 2001 and April 23, 2001, JOHNSON and others

forged and caused to be forged two letters purportedly from AOL reducing the commission rate

PurchasePro owed AOL.

### The $9 Million Bulk Subscriptions Amendment

25.     In or about the first days of April 2001, JOHNSON threatened to stop payment on the $12.2 million check unless WAKEFORD and others at AOL agreed to execute the $9 million Amended Bulk Subscriptions Agreement, which was necessary for PurchasePro to reach its $42 million quarterly revenue projection. On or about April 5, 2001, JOHNSON, WAKEFORD and others caused AOL to execute the $9 million amendment.

### The AuctioNet Statement of Work

26.     In or about the last days of March 2001 and early April 2001, JOHNSON, WAKEFORD, WIEGAND, TULI, KENNEDY and BENYO created and caused others to create a fraudulent $3.65 million contract known as the AuctioNet Statement of Work.

27.     The AuctioNet Statement of Work required AOL to pay PurchasePro approximately $3.65 million for integration work allegedly performed by PurchasePro in the first quarter of 2001. JOHNSON, WAKEFORD, WIEGAND, TULI, KENNEDY and BENYO knew that the work necessary to support AOL's payment of approximately $3.65 million had not been completed in the first quarter of 2001 and that PurchasePro employees were still drafting the Statement of Work, which defined the work necessary for the integration and the $3.65 million payment, after the close of the first quarter and during the first week of April 2001. Nevertheless, the conspirators fraudulently back-dated and caused the Statement of Work to be back-dated to February 5, 2001 to give the false appearances that the integration project had been ongoing for nearly two months, when it had not.

28.     The conspirators and others falsely and fraudulently represented and demonstrated to PurchasePro's outside auditors that PurchasePro had completed the full integration work by March 31, 2001, in that:

        a.      KENNEDY and BENYO created and caused others to create an Internet link to support the false and fraudulent representation to PurchasePro's outside auditors that PurchasePro had completed the full integration work called for by the Statement of Work by March 31, 2001; and

16

      b.     WAKEFORD, TULI and others made and caused others to make false confirmations to PurchasePro's outside auditors that the work under the Statement of Work had been completed by PurchasePro and accepted by AOL as of March 31, 2001.

29.     The conspirators utilized the fraudulent AuctioNet Statement of Work, for which the AOL signature had been cut-and-pasted, as part of the scheme to deceive the auditors in April 2001.

30.     Based on these fraudulent arrangements, the conspirators and others falsely told and caused others to tell PurchasePro's outside auditors and Board of Directors that PurchasePro had met its first quarter 2001 revenue target of $42 million.

**B.    PurchasePro's Public Statements**

31.     On April 26, 2001, after PurchasePro's auditors discovered and rejected some of the fraudulent revenue, JOHNSON, WIEGAND, BENYO and others publicly announced that PurchasePro had generated approximately $29.8 million in first quarter revenue. The $9 million for the back-dated Bulk Subscriptions Agreement, the $3.65 million for the fraudulent and back-dated Statement of Work and millions for marketplace license sales with secret side deals and back-dated documents were included in the $29.8 million revenue figure.

32.     On May 29, 2001, after PurchasePro's auditors discovered and rejected additional fraudulent revenue including fraudulent revenue that was included in the April 26th announcement, PurchasePro filed its quarterly SEC report on Form 10-Q for the quarterly period ending March 31, 2001, reporting quarterly revenues totaling approximately $16.02 million. The Form 10-Q still included revenue for marketplace license sales with secret side deals and back-dated documents.

**C.    Payments to the Defendants**

33.     In early April 2001, WIEGAND and others caused PurchasePro to make the payments to JOHNSON, WIEGAND, BENYO, KENNEDY and others.

34.     On or about April 10, 2001, JOHNSON, WIEGAND and others caused the PurchasePro Board of Directors to approve, among others, stock option grants for WIEGAND, BENYO, KENNEDY and others.

## IV.    OVERT ACTS

In furtherance of the conspiracy and to effect its illegal objects, on or about the dates listed below, in the Eastern District of Virginia and elsewhere, defendants BENYO, JOHNSON, KENNEDY, TULI, WAKEFORD and WIEGAND, and their co-conspirators, Anderson, Boeth, Layne, McGhee, Miller, Sholeff, and others known and unknown to the Grand Jury, committed and caused to be committed the following overt acts, among others:

35.     On or about December 21, 2000, JOHNSON, WAKEFORD, WIEGAND and others caused a letter to be sent from PurchasePro to AOL falsely stating that AOL had earned PurchasePro warrants worth $30 million.

36.     Between in or about the end of December 2000 and early January 2001, WAKEFORD and others told AuctioNet that AOL would participate in a roundtrip deal among AOL, PurchasePro and AuctioNet but that the written agreement between AOL and AuctioNet could not be executed until January 2001 in order to conceal the linkage between the deals.

37.     On or about February 12, 2001, JOHNSON and others falsely stated to Arthur Andersen, among other things, that "[t]here has been no . . . [f]raud involving management" and that all "side agreements" had been properly disclosed.

### First Quarter 2001 Marketplace License Sales Campaign

38.     On or about March 15, 2001, JOHNSON traveled to AOL's office in New York, New York in order to work with WAKEFORD and other AOL employees to sell PurchasePro products, including marketplace licenses.

39.     On or about March 29, 2001, JOHNSON sent an e-mail to WAKEFORD stating that "free" marketplace licenses should not be that difficult to sell.

### Bigstep

40.     On or about March 31, 2001, TULI, WAKEFORD and others caused Bigstep to execute a Marketplace Software License Agreement with PurchasePro for $1.1 million and dated the agreement March 29, 2001.

41.     On or about April 2, 2001, TULI sent an e-mail regarding AOL's oral promise to restructure the payments Bigstep owed to AOL in exchange for Bigstep's purchase of a marketplace license from PurchasePro and stated: "Please delete after you take a look. No written agreement was ever consummated."

42.     On or about April 19, 2001, TULI sent an e-mail to WAKEFORD and others confirming that "we promised to have the deal changed within 3 weeks of the term ending."

### Cisco

43.     On or about March 22, 2001, WAKEFORD and others caused AOL to discount by $440,000 the $5 million in advertising bought by Cisco so that Cisco could purchase a marketplace license from PurchasePro for $440,000.

44.     On or about March 28, 2001, WAKEFORD and others caused Cisco to execute a Marketplace Software License Agreement with PurchasePro for $440,000.

### Citibank

45.     Between on or about March 28, 2001 and April 2, 2001, WAKEFORD and others tried to induce Citibank to purchase a PurchasePro marketplace license for approximately $3.7 million for which AOL and PurchasePro would provide Citibank approximately twice that amount in debt forgiveness, Internet advertising and other benefits.

### Future Media

46.     On or about March 26, 2001, WAKEFORD and others orally promised Future Media that AOL would buy more products from Future Media at higher prices if Future Media purchased a marketplace license from PurchasePro. WAKEFORD and others refused to put AOL's promise to Future Media in writing.

19

47.    On or about March 30, 2001, WAKEFORD and others caused Future Media to execute a Marketplace Software License Agreement with PurchasePro for $1 million.

### Hewlett-Packard

48.    On or about March 27, 2001, Anderson and others caused Hewlett-Packard to execute a Marketplace Software License Agreement with PurchasePro for $187, 000.

### Homestore

49.    On or about March 20, 2001, an AOL co-conspirator and others promised Homestore that AOL would shift advertising to reimburse Homestore if it purchased a PurchasePro marketplace license.

50.    On or about March 26, 2001, an AOL co-conspirator and others caused Homestore to execute a Marketplace Software License Agreement with PurchasePro for $3.7 million.

### Information Markets

51.    On or about March 26, 2001, WAKEFORD and others caused AOL to discount by $100,000 the $1 million in advertising bought by Information Markets so that Information Markets could purchase a $100,000 marketplace license from PurchasePro.

52.    On or about March 29, 2001, WAKEFORD and others caused Information Markets to execute a Marketplace Software License Agreement with PurchasePro for $100,000.

### InsureZone

53.    On or about March 30, 2001, Anderson and others, with WIEGAND's knowledge, reduced InsureZone's existing payment obligations to PurchasePro by $180,000 so that InsureZone could purchase a marketplace license for $180,000.

54.    On or about March 30, 2001, a PurchasePro employee caused InsureZone to execute a Marketplace Software License Agreement with PurchasePro for $180,000.

### NUAG

55.    On or about March 30, 2001, WIEGAND, KENNEDY and others caused NUAG to execute a Marketplace Software License Agreement (International Edition) with PurchasePro

20

for $3.7 million in exchange for an oral promise by PurchasePro to purchase $4.2 million of NUAG products in the second quarter of 2001.

56.    In or about late March or early April 2001, WIEGAND and others executed and caused to be executed an internal sales representation letter that falsely represented that there were no unidentified oral agreements or other written agreements related to the signed software license agreement with NUAG.

57.    On or about April 9, 2001, WIEGAND, KENNEDY and others caused PurchasePro to enter into a Letter of Intent that required PurchasePro to pay NUAG approximately $4.2 million for NUAG products in the second quarter of 2001.

### Office Depot

58.    On or about March 30, 2001, JOHNSON, WAKEFORD, BENYO and others asked Office Depot to purchase approximately $9.8 million in bulk subscriptions from PurchasePro in exchange for which AOL and PurchasePro would provide Office Depot with approximately three times that amount in debt forgiveness, advertising and other benefits.

59.    On or about March 30, 2001, JOHNSON, WAKEFORD, BENYO and others requested that Office Depot back-date the proposed bulk subscriptions agreement to avoid the suspicion of PurchasePro's auditors.

### Spherion

60.    On or about March 23, 2001, WAKEFORD and others promised that AOL would increase its purchase of Spherion services by at least $30 million over the next year and spend at least $100 million on Spherion services over the next eighteen months if Spherion bought a PurchasePro marketplace license.

61.    On or about March 28, 2001, WAKEFORD and others caused Spherion to execute a Marketplace Software License Agreement with PurchasePro for $1.1 million.

21

*Travelocity*

62.      On or about March 21, 2001, WAKEFORD and others orally promised that AOL would help Travelocity recoup its costs if Travelocity bought a PurchasePro marketplace license. WAKEFORD refused to put his promise to Travelocity in writing.

63.      On or about March 30, 2001, WAKEFORD and others caused Travelocity to execute a Marketplace Software License Agreement with PurchasePro for $1 million.

*Viva Magnetics*

64.      On or about March 28, 2001, WAKEFORD and others caused Viva Magnetics to executed a Marketplace Software License Agreement with PurchasePro for $440,000.

*Yellowbrix*

65.      On or about March 29, 2001, WAKEFORD, TULI and others agreed that AOL would provide payment relief or otherwise restructure an existing agreement between AOL and Yellowbrix if Yellowbrix bought a PurchasePro marketplace license.

66.      On or about March 30, 2001, WAKEFORD criticized a subordinate for putting AOL's promise to restructure the Yellowbrix agreement in writing.

67.      On or about March 31, 2001, WAKEFORD, TULI and others caused YellowBrix to execute a Marketplace Software License Agreement with PurchasePro for $440,000.

**Keeping the Quarter Open**

68.      In or about early April 2001, JOHNSON stated that the quarter ends when I say it ends, not when the calendar says it ends.

69.      On or about April 1, 2001, JOHNSON sent an e-mail that stated: "Now I can't sleep until my [quarter] is done – I have banked my future on you big guy!!  I trust you and would have waited to pay these commissions if it wasn't for my trust in you....  We need Flowers [i.e. 1-800-Flowers], Monster and 1.5 more deals and I need the paperwork for the quarter sent no later than Wednesday ... PurchasePro and my entire financial future does depend on this, in other words I will be wiped out otherwise."

70.    On or about April 1, 2001, WAKEFORD sent an e-mail discussing "Deals to Get" and assigning sales teams to close marketplace license sales to 1-800-Flowers, Monster, Proxicom and approximately five other businesses.

71.    On or about April 2, 2001, Anderson sent JOHNSON an e-mail showing that PurchasePro needed at least an additional $7.4 million in AOL referrals in order to make its first quarter revenue projections.

72.    On or about April 4, 2001, JOHNSON sent an e-mail to a senior AOL officer that stated: "Thanks – getting tons of heat and need your help. I could be buried and I mean buried without your help – thanks, without you I have no idea what I would do – my entire business life I have never felt this helpless or desperate … I have early meeting with our auditors so any info will be helpful – I will have to give them the remainder of contracts completed in Q1 so I need all AOL docs early please. Your friend, Jr."

73.    On or about April 6, 2001, a PurchasePro employee sent WIEGAND and others an e-mail listing five contracts for which PurchasePro was still awaiting documentation, including 1-800-Flowers, China.com and Monster.

### *1-800-Flowers*

74.    On or about April 2, 2001, WAKEFORD and others offered 1-800-Flowers advertising worth $5 million if 1-800-Flowers purchased a marketplace license for $3.7 million.

### *China.com*

75.    On or about April 2, 2001, WAKEFORD and others caused AOL and China.com to execute an agreement to reduce by $4 million monies owed by China.com to AOL for advertising in exchange for China.com agreeing to purchase a marketplace license from PurchasePro for approximately $3.7 million.

76.    On or about April 4, 2001, JOHNSON, WAKEFORD and others caused China.com to execute a Marketplace Software License Agreement with PurchasePro for $3.7 million and caused it to be back-dated to March 30, 2001.

23

### Garg Data

77.    In or about the first week of April 2001, JOHNSON and others caused Garg Data to execute an undated Marketplace Software License Agreement with PurchasePro for $3.5 million.

78.    Between on or about April 4, 2001 and on or about April 10, 2001, KENNEDY and others caused PurchasePro to enter into agreements with Sagence Systems, a company related to Garg Data, that required PurchasePro to pay Sagence Systems a total of approximately $8.5 million, with $4 million paid immediately.

### Monster

79.    On or about April 4, 2001, WAKEFORD sent by e-mail to Monster an irrevocable letter from PurchasePro to AOL reallocating approximately $6.2 million of advertising inventory from AOL to Monster.

80.    On or about April 6, 2001, JOHNSON, WAKEFORD and others caused Monster to execute a Marketplace Software License Agreement with PurchasePro for $3 million and caused the agreement to be back-dated to March 31, 2001.

### Proxicom

81.    On or about April 4, 2001, WAKEFORD, JOHNSON and others tried to induce Proxicom, a company located in Reston, Virginia, to purchase a $3.7 million PurchasePro marketplace license by verbally promising that AOL would buy back the $3.7 million marketplace license if Proxicom was unable to sell it.  WAKEFORD refused to put his promise to Proxicom in writing.

### First Quarter 2001 Warrants

82.    On or about March 28, 2001, JOHNSON, WAKEFORD and others agreed that PurchasePro, not AOL, would provide the revenue necessary for AOL to earn the first quarter 2001 performance warrants.

83.   On or about March 30, 2001, JOHNSON executed a letter to AOL falsely stating that AOL had earned 1,123,828 performance warrants, which were worth approximately $7.7 million.

**The Statement of Work**

84.   On or about March 30, 2001, WAKEFORD sent an e-mail to Layne attaching a document to help Layne create the AuctioNet Statement of Work.

85.   On or about March 30, 2001, BENYO directed a PurchasePro employee to send a false e-mail regarding the status of the AuctioNet integration project.

86.   On or about March 31, 2001, TULI sent an e-mail, which was forwarded to WIEGAND, that attached language for the Statement of Work.

87.   On or about March 31, 2001, WIEGAND instructed a PurchasePro employee to prepare the AuctioNet Statement of Work.

88.   On or about March 31, 2001, BENYO sent an e-mail stating that further work would need to be done on April 1, 2001 to draft the Statement of Work.

89.   On or about April 2, 2001, multiple employees from PurchasePro's technology group met to discuss the work that needed to be done to integrate quickly AuctioNet's auction functionality on to NetBusiness.

90.   On or about April 2, 2001, BENYO, KENNEDY and others agreed that because PurchasePro did not complete full integration of AuctioNet's auction functionality on to NetBusiness by the end of the first quarter 2001, BENYO and his subordinates should create an Internet link between NetBusiness and AuctioNet's website and then try to finish the integration work before Arthur Andersen arrived for its quarterly review.

91.   On or about April 4, 2001, BENYO, KENNEDY and others caused an Internet link from NetBusiness to AuctioNet to be launched.

92.   On or about April 5, 2001, BENYO and others finalized the AuctioNet Statement of Work and caused it to be dated "February 5, 2001."

93.     Between on or about April 7, 2001 and on or about April 10, 2001, KENNEDY executed the AuctioNet Statement of Work dated "February 5, 2001."

94.     On or about April 7, 2001, JOHNSON directed others to cut and paste the signature of an AOL officer on the AuctioNet Statement of Work dated "February 5, 2001."

95.     In or about mid-April 2001, JOHNSON, WIEGAND, KENNEDY, BENYO and others caused PurchasePro to submit the fraudulent and back-dated AuctioNet Statement of Work to Arthur Andersen in order to recognize approximately $3.65 million in revenue for the first quarter of 2001.

96.     On or about April 20, 2001, a PurchasePro employee, with BENYO's knowledge, demonstrated the Internet link from NetBusiness to AuctioNet for Arthur Andersen in an effort to mislead the auditors.

97.     On or about April 20, 2001, WIEGAND caused a confirmation letter to Arthur Andersen for the AuctioNet Statement of Work to be forwarded to AOL.

98.     On or about April 20, 2001, BENYO and others caused a PurchasePro employee to e-mail an electronic version of the Statement of Work and acceptance documents to TULI.

99.     On or about April 20, 2001, TULI executed a confirmation letter on behalf of AOL to PurchasePro's auditors that falsely stated, among other things, "all work covered under the Statement of Work dated February 5, 2001 was completed and accepted as of March 30, 2001."

100.    On or about April 20, 2001, WAKEFORD faxed TULI's confirmation letter to PurchasePro.

101.    On or about April 24, 2001, WIEGAND sent an e-mail containing questions WIEGAND anticipated Arthur Andersen would ask TULI during a telephone conference call about the AuctioNet Statement of Work.

102.    On or about April 24, 2001, Layne sent TULI and WAKEFORD an e-mail that included the answers TULI should give in order to deceive Arthur Andersen about the completion of the AuctioNet integration in the first quarter.

26

103.    On or about April 24, 2001, TULI falsely stated in a telephone conference call with Arthur Andersen that the integration work under the AuctioNet Statement of Work had been completed by March 31, 2001.

104.    On or about April 24, 2001, Miller, with the assistance of KENNEDY and knowledge of WIEGAND, sent a memorandum to Arthur Andersen supporting the $3.65 million in first quarter 2001 revenue resulting from the AuctioNet Statement of Work.

**$12.2 Million Check**

105.    On or about March 30, 2001, JOHNSON caused multiple blank, pre-signed PurchasePro checks to be sent to himself in New York, New York.

106.    On or about March 31, 2001, JOHNSON gave WAKEFORD and others at AOL a PurchasePro check, number 014808, in the amount of $12.2 million, dated "March 30, 2001" and containing the handwritten notation "3/30/01 AOL $12,200,000 Commissions" on the check register.

107.    On or about March 31, 2001, JOHNSON took back the $12.2 million check.

108.    On or about March 31, 2001, WAKEFORD sent JOHNSON an e-mail stating that a senior AOL officer "says that he is knee deep in blood and you are [expletive] on his head – [he's] been on the phone screaming on your behalf. He's flying in tomorrow and coming straight to your hotel – as he says, you better tell him your hotel room or he will knock on [expletive] every door."

109.    On or about March 31, 2001, JOHNSON sent an e-mail to WAKEFORD that stated:

> Kent, I have pd or enabled AOL to recognize 120+ million dollars and dedicated myself and Jeff Anderson 100% to AOL in Q1 and now the rules are changing and I am left holding the bag – so far this has been a one-sided relationship and now PPRO will be crushed and it will personally cause my world to collapse and my family – I bet on AOL to deliver and because nobody had urgency except for the 11th hour PPRO and my world will hurt while AOL has collected a fortune from us and been give[n] 'everything' that I have and yet here I am on the eve of my life being decimated – we have not been paid a single penny on those deals yet again ol' PPRO and Jr should jump through hoops and give AOL money so they can support their quarter while you'll want to talk to me

about spinning a story for the street—the story here is that I pd you tons of money created revenue with my own sells last quarter and gave away 6% of a company I have dedicated every dollar and every second for 5 years without being pd a dime—I expect AOL to step up to the plate and deliver for me like I have every time I have been asked including another 5-million in TW only 1-month ago – I have spent 16 hour days with you and watch the apathy that got us here and ther [sic] has been lots of talk and very little walk. . . . Bottom line is that if we miss everything ultimately will hit the fan because of the significance of warrants, dollars, and the awareness of analysts and media. . . . I pray this can be resolved because I enjoy the relationship and that is why I sold my soul.  Jr.

110.   On or about March 31, 2001, JOHNSON gave the $12.2. million check, number 014808, back to WAKEFORD and others.

111.   On or about April 1, 2001, WAKEFORD caused a photocopy of the $12.2 million check and check register to be sent by facsimile from New York, New York to AOL finance personnel in Dulles, Virginia.

112.   On or about April 2, 2001, JOHNSON sent an e-mail to WAKEFORD that stated: "Again it appears the urgency to get me the contracts hasn't happened.  I am prepared to unwind the entire Q1 transaction including the following: Warrants delivered but not earned, [c]arriage not delivered, product development not delivered and the T/W ads that we did not want a[nd] did as a favor – commission check for 12.2 million is inaccurate and should reflect a number substantially less including us being re-imbursed for Q4 and Q1 deals which will total about 12.7 million and then we will give you the appropriate commission 6.6 which will result in a net to PPRO of 6.1 – we did deliver the services for the pre-paid subs and expect payment ... this is ugly for one reason and that is AOL didn't deliver their end of the deal."

113.   On or about April 2, 2001, JOHNSON sent an e-mail to WAKEFORD that stated: "I expect to have 12.8 [million] in revenue – or lower commissions, no exceptions by tomorrow afternoon no no excuses – every option will be reviewed – no joke I did stop payment today, however I will write you another check tomorrow.  Jr."

114.   On or about April 3, 2001, JOHNSON gave WAKEFORD and others at AOL a new PurchasePro check, number 014809, in the amount of $12.2 million and dated "30 March 01."

115.    On or about April 5, 2001, a co-conspirator at AOL executed and delivered to PurchasePro a letter that stated: "We are in receipt of your commission check for $12,2000,000. We have received referral letters with respect to $6,700,000 of commissions earned. You have assured us that we have earned a total of $12,200,000 in commissions and paid us accordingly. We look forward to receiving the documentation confirming the additional marketplace sales on which AOL has earned the remaining commissions as soon as possible."

116.    On or about April 19, 2001, JOHNSON directed others to cut and paste the signature of a senior AOL officer on a letter purportedly from AOL to PurchasePro concerning application of PurchasePro's $12.2 million payment.

117.    On or about April 23, 2001, JOHNSON directed others to cut and paste the signature of a senior AOL officer on a letter purportedly from AOL to PurchasePro confirming the commission rate and listing total first quarter referral revenue as "$17,324,000."

**First Quarter 2001 Bulk Subscriptions**

118.    On or about March 31, 2001, JOHNSON sent an e-mail to WAKEFORD, and forwarded it to WIEGAND and others, stating that "This Quarter AOL will recognize 6-7 from impressions 2-3 from development, 3 from T/W adv plus 7.7 b/s and 6+ commissions --- if you do the math that somewhere between 25-27 million and that is all from us and AOL can't figure out if they will fund 9.8 for pre-pds that we have loaded and marketed to because of a rev set-off----we are asking for 14 from your partners and only 9.8 from AOL===EASY calculation is you got 27-9.8=17.2net from PPRO and PPRO gets partner net of 14 out of a gross 20 and subs for 9.8 and the total is 23.8 and from AOL directly 9.8—Kent, I am not sure of AOL's barrier of fairness but I am having difficult understanding why the trouble delivering on a promise—I am having trouble comprehending the hesitation."

119.    On or about March 31, 2001, JOHNSON sent an e-mail to a co-conspirator at AOL threatening to hold the $12.2 million check until AOL signed the bulk subscriptions agreement.

29

120.    On or about April 5, 2001, a co-conspirator at AOL executed an approximately $9 million Amended Bulk Subscription Agreement dated "as of March 31, 2001."

121.    On or about April 18, 2001, TULI sent an e-mail discussing the $9 million bulk subscription agreement that stated: "This is the scoop. During the week of 4/5 Wakeford and Junior and [a co-conspirator at AOL] had to make Junior whole to help him make his numbers. [$]9M[illion] in subscriptions was something Wakeford and [the co-conspirator] put together because we couldn't sell enough marketplaces despite best efforts. I was in on most deals, the marketplace sale was really tough in this market. The justification was not ...mine. [Business Affairs] put together an e-mail to justify the expense. It was clear that [the AOL CFO] would have an issue with this approach the email he received basically said that NetB thought we could get 11% click thru on Marketplace subscriptions. Not very convincing. [The AOL CFO] has good questions about Jan/Feb vs. March and we will have to build a legitimate answer. We are reacting to the BA sales effort. That is how this came about."

### Representations to PurchasePro's Outside Auditors

122.    In or about mid-April 2001, JOHNSON, WIEGAND and others caused PurchasePro to submit preliminary revenue numbers for the first quarter 2001 to Arthur Andersen that sought recognition of approximately $42 million in revenue.

### Public Statements

123.    On or about February 12, 2001, JOHNSON, WIEGAND, BENYO and others caused PurchasePro to issue a press release that stated: "PurchasePro expects first quarter revenue of more than $42 million, a 25 percent quarter-over-quarter increase."

124.    On or about March 7, 2001, JOHNSON and others caused PurchasePro to issue a public statement that revenues were on track to achieve expected first quarter revenue in excess of $42 million.

125.    On or about April 26, 2001, JOHNSON, WIEGAND, BENYO and others caused PurchasePro to issue a press release announcing that it earned approximately $29.8 million in revenue for the quarter ending March 31, 2001.

126.    On or about April 26, 2001, JOHNSON, WIEGAND, BENYO and others conducted a public conference call with securities analysts and others in which PurchasePro announced revenue of approximately $29.8 million for the quarter ended March 31, 2001.

127.    On or about May 29, 2001, JOHNSON, WIEGAND and others caused PurchasePro to file a Form 10-Q with the SEC's EDGAR Management Office of Information Technology for the quarter ending March 31, 2001, which stated that PurchasePro had revenues of approximately $16 million.

**Efforts to Conceal the Fraud**

128.    In or about mid-April 2001, JOHNSON directed a subordinate at PurchasePro to delete e-mails to and from AOL from JOHNSON and others relating to the first quarter of 2001.

129.    In or about mid-April 2001, WIEGAND directed a subordinate at PurchasePro to delete WIEGAND'S e-mails relating to the first quarter of 2001.

130.    In or about early May 2001, JOHNSON directed a subordinate to destroy PurchasePro documents relating to AOL.

131.    On or about February 14, 2002, WAKEFORD made false statements under oath before the SEC about his involvement in the scheme.

132.    On or about March 12 and 13, 2002, JOHNSON made false statements under oath before the SEC about his involvement in the scheme.

133.    On or about April 10, 2002, TULI made false statements under oath before the SEC about his involvement in the scheme.

134.    On or about April 10, 2002, KENNEDY made false statements under oath before the SEC about his involvement in the scheme.

135.    On or about June 11, 2003, KENNEDY made false statements to the FBI about his involvement in the scheme.

136.    On or about November 24, 2003, WIEGAND made false statements to the FBI about his involvement in the scheme.

31

**Retention Payments**

137.    On or about April 5, 2001, JOHNSON, WIEGAND and others caused PurchasePro to pay "retention bonuses" to the following people in the following amounts:

    a.     JOHNSON -- $2 million;

    b.     WIEGAND -- $100,000;

    c.     KENNEDY -- $100,000;

    d.     BENYO -- $100,000.

138.    On or about April 10, 2001, JOHNSON, WIEGAND and others caused PurchasePro to grant stock options to the following people in the following amounts:

    a.     BENYO -- 75,000;

    b.     KENNEDY -- 50,000;

    c.     WIEGAND -- 25,000.

       (All in violation of Title 18, United States Code, Section 371)

## COUNT TWO

(Securities Fraud: Issuing False Press Release – ALL DEFENDANTS)

THE GRAND JURY FURTHER CHARGES THAT:

1.      The allegations contained in paragraphs one through forty-one of the Introductory Allegations and paragraphs three through one hundred thirty-eight of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.      On or about April 26, 2001, within the Eastern District of Virginia and elsewhere, defendants BENYO, JOHNSON, KENNEDY, TULI, WAKEFORD, WIEGAND and others did knowingly and willfully, directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges: (a) employ devices, schemes and artifices to defraud; (b) make and cause others to make untrue statements of material fact and omit and cause others to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers and sellers of PurchasePro securities, to wit, causing PurchasePro to issue a false and misleading press release announcing the financial results for its fiscal quarter ending March 31, 2001.  Specifically, the defendants caused PurchasePro to:  (i) include revenue in the financial results reported in the press release that was based on back-dated and forged contracts; (ii) include revenue in the financial results reported in the press release that was based on marketplace license sales resulting from undisclosed secret side deals; (iii) omit to state in the press release that the secret side deals had not been disclosed to PurchasePro's outside auditors; and (iv) omit to state in the press release that fraudulent revenue-related entries were made at the direction of management.

(All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; Title 18, United States Code, Section 2)

## COUNT THREE

(Securities Fraud:  Filing False SEC Form 10-Q – ALL DEFENDANTS)

THE GRAND JURY FURTHER CHARGES THAT:

1.      The allegations contained in paragraphs one through forty-one of the Introductory Allegations and paragraphs three through one hundred thirty-eight of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.      On or about May 29, 2001, within the Eastern District of Virginia and elsewhere, defendants JOHNSON, WAKEFORD, WIEGAND and TULI, aided and abetted by each other and others, did knowingly and willfully, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges: (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material fact and omit to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in reports and documents required to filed with the SEC under the Securities Exchange Act of 1934 and rules and regulations promulgated thereunder; and (c) engage in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon purchasers of PurchasePro securities, to wit, causing PurchasePro to prepare and file with the SEC an SEC Form 10-Q, which reported falsely and fraudulently inflated financial results for the quarter ending March 31, 2001.  Specifically, the defendants caused PurchasePro to: (i) include in the filed financial results revenue that was based on back-dated, forged and fraudulent documents; (ii) include in the filed financial results revenue that was recorded based on marketplace license sales resulting from undisclosed secret side deals; (iii) omit to state in its filing that secret side deals had not been disclosed to PurchasePro's outside auditors; and (iv) omit to disclose that fraudulent revenue-related entries were made at the direction of management.

(All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2)

34

## COUNT FOUR

(False Statements to Auditors – JOHNSON, WAKEFORD, WIEGAND and TULI)

THE GRAND JURY FURTHER CHARGES THAT:

1.      The allegations contained in paragraphs one through forty-one of the Introductory Allegations and paragraphs three through one hundred thirty-eight of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.      In or about April 2001, in the Eastern District of Virginia and elsewhere, defendants JOHNSON, WAKEFORD, WIEGAND and TULI unlawfully, willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading to the outside auditors of PurchasePro, an issuer of a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, in connection with examination and review of the financial statements of PurchasePro as required by law to be made, and preparation and filing of a document and report required to be filed with the SEC pursuant to the rules and regulations enacted by the SEC.

3.      Specifically, JOHNSON, WAKEFORD, WIEGAND and TULI stated and caused others to state that all of the work covered under the Statement of Work dated February 5, 2001, was completed and accepted by AOL as of March 31, 2001, when, in fact, they knew it was not.

(All in violation of Title 15, United States Code, Sections 78ff, 78m(a) and 78m(b); Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18, United States Code, Section 2.)

35

## COUNT FIVE

(False Statements to Auditors – JOHNSON, WAKEFORD, WIEGAND and TULI)

THE GRAND JURY FURTHER CHARGES THAT:

1.      The allegations contained in paragraphs one through forty-one of the Introductory Allegations and paragraphs three through one hundred thirty-eight of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.      In or about April 2001, in the Eastern District of Virginia and elsewhere, defendants JOHNSON, WAKEFORD, WIEGAND and TULI unlawfully, willfully and knowingly, directly and indirectly, (a) made and caused to be made materially false and misleading statements and (b) omitted to state, and caused others to omit to state, material facts necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading to the outside auditors of PurchasePro, an issuer of a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, in connection with examination and review of the financial statements of PurchasePro as required by law to be made, and preparation and filing of a document and report required to be filed with the SEC pursuant to the rules and regulations enacted by the SEC.

3.      Specifically, JOHNSON, WAKEFORD, WIEGAND and TULI confirmed and caused others to confirm on a conference call with PurchasePro's outside auditors that the auction integration work was completed by the close of the first quarter of 2001, ending March 31, 2001, and that no integration work was required after the first quarter, when, in fact, they knew that full integration was not completed and that work continued into the second quarter.

(All in violation of Title 15, United States Code, Sections 78ff, 78m(a) and 78m(b); Title 17, Code of Federal Regulations, Section 240.13b2-2; and Title 18, United States Code, Section 2.)

## COUNTS SIX THROUGH TWENTY-FIVE

(Wire Fraud and Aiding and Abetting – JOHNSON, WAKEFORD, TULI and BENYO)

THE GRAND JURY FURTHER CHARGES THAT:

1.    The allegations contained in paragraphs one through forty-one of the Introductory Allegations and paragraphs three through one hundred thirty-eight of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.    On or about the respective dates shown below in Counts six through twenty-five, within the Eastern District of Virginia and elsewhere, defendants JOHNSON, WAKEFORD, TULI, BENYO and others, for the purpose of executing the scheme and artifice to defraud described above, to deprive PurchasePro and AOL of its intangible right of honest services, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did knowingly transmit, and cause others to transmit, by wire communications in interstate commerce certain writings, signs, signals, pictures and sounds, as described below:

| Count | Date | Defendant | State of Origin | State of Receipt | Communication |
|-------|------|-----------|-----------------|------------------|---------------|
| 6 | 3/17/2001 | Wakeford | New York | New York | E-Mail |
| 7 | 3/29/2001 | Johnson<br>Wakeford | New York | New York | E-Mail |
| 8 | 3/29/2001 | Wakeford | New York | New York | E-Mail |
| 9 | 3/30/2001 | Wakeford | New York | Nevada | E-Mail |
| 10 | 3/30/2001 | Benyo<br>Wakeford | Virginia | New York<br>Nevada<br>Florida | Telephone |
| 11 | 3/31/2001 | Tuli | Virginia | Nevada | E-Mail |
| 12 | 3/31/2001 | Tuli<br>Wakeford | Virginia | New York | E-Mail |
| 13 | 3/31/2001 | Wakeford | New York | New York | Instant Messaging |
| 14 | 3/31/2001 | Johnson<br>Wakeford | New York | New York | E-Mail |
| 15 | 4/1/2001 | Johnson | New York | Virginia | E-Mail |

| Count | Date | Defendant | State of Origin | State of Receipt | Communication |
|-------|------|-----------|-----------------|------------------|---------------|
| 16 | 4/1/2001 | Wakeford | New York | Texas | E-Mail |
| 17 | 4/2/2001 | Johnson Wakeford | New York | New York | E-Mail |
| 18 | 4/2/2001 | Johnson Wakeford | New York | New York | E-Mail |
| 19 | 4/2/2001 | Wakeford | New York | New York | E-Mail |
| 20 | 4/3/2001 | Wakeford | New York | Virginia | E-Mail |
| 21 | 4/4/2001 | Wakeford | New York | Massachusetts | E-Mail |
| 22 | 4/4/2001 | Johnson | New York | Virginia | E-Mail |
| 23 | 4 /19/2001 | Tuli Wakeford | Virginia | New York | E-Mail |
| 24 | 4/20/2001 | Tuli Benyo | Nevada | Virginia | E-Mail |
| 25 | 4/24/2001 | Tuli Wakeford | Nevada | Virginia New York | E-Mail |

With the exception of count 10, the wire transmissions described above were e-mails, instant messages and other forms of wire transmissions that entered and exited the Eastern District of Virginia and were transmitted from and to another state by means of an AOL server located in the Eastern District of Virginia.

(All in violation of Title 18, United States Code, Sections 1343, 1346 and 2.)

## COUNTS TWENTY-SIX THROUGH TWENTY-SEVEN

### (Wire Fraud – JOHNSON and WAKEFORD)

THE GRAND JURY FURTHER CHARGES THAT:

1.    The allegations contained in paragraphs one through forty-one of the Introductory Allegations and paragraphs three through one hundred thirty-eight of Count One of this Indictment are repeated and realleged as if fully set forth herein.

2.   On or about the respective dates shown below in Counts twenty-six through twenty-seven, within the Eastern District of Virginia and elsewhere, defendants JOHNSON, WAKEFORD and others, for the purpose of executing the scheme and artifice described above, and to deprive PurchasePro and AOL of its intangible right to honest services, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did knowingly transmit, and cause others to transmit, by wire communications in interstate commerce certain writings, signs, signals, pictures and sounds, as described below:

| Count | Date | Defendant | State of Origin | State of Receipt | Communication |
|-------|------|-----------|-----------------|------------------|---------------|
| 26 | 3/30/2001 | Johnson | New York | Virginia | Facsimile |
| 27 | 4/1/2001 | Wakeford | New York | Virginia | Facsimile |

(All in violation of Title 18, United States Code, Sections 1343, 1346 and 2.)

**COUNT TWENTY-EIGHT**

(Obstruction of Justice - JOHNSON)

THE GRAND JURY FURTHER CHARGES THAT:

1.      In or about April 2001 through December 2003, within the Eastern District of Virginia and elsewhere, the defendant, CHARLES E. JOHNSON, JR., did corruptly persuade and attempt to persuade, and engaged and attempted to engage in misleading conduct toward another person, to influence the testimony of another person in an official proceeding, to wit, the investigation of a federal Grand Jury in the Eastern District of Virginia.

2.      In May 2001, the Division of Enforcement of the United States Securities and Exchange Commission ("SEC") opened an investigation concerning PurchasePro. The SEC investigated possible violations of the anti-fraud, books and records, internal accounting controls, insider trading, lying to auditors and disclosure provisions of the federal securities laws. The investigation encompassed, among other things, the relationship between PurchasePro, AOL, and other third party customers, as well as the conduct of certain officers, directors, executives, and senior-level employees within PurchasePro and AOL regarding their participation in a scheme to falsely, fraudulently and materially inflate PurchasePro's revenues. Pursuant to this investigation, the SEC staff (i) issued subpoenas requiring the production of documents; (ii) conducted witness interviews; and (iii) took the sworn testimony of numerous witnesses.

3.      In or about January and February 2002, JOHNSON discussed the SEC's investigation with certain of his co-conspirators from PurchasePro. JOHNSON instructed his co-conspirators to lie under oath during their sworn testimony before the SEC. JOHNSON coached these co-conspirators about the false story they all agreed to tell the SEC about their activities at PurchasePro.

4.      In or about February 2002, these co-conspirators in fact did lie under oath during sworn testimony before the SEC about one or more subjects material to the SEC's investigation.

40

5.    On or about July 26, 2002, the Federal Bureau of Investigation ("FBI")
commenced a criminal investigation of matters relating to AOL's relationship with its partners,
including PurchasePro, involving potential violations of federal criminal laws.  The FBI's
investigation included an examination of PurchasePro's reported revenues in 2000 and 2001, the
sales of marketplace licenses and use of secret side deals and efforts to destroy documents and
obstruct investigations.

6.    On or about February 7, 2003, a federal Grand Jury in the Eastern District of
Virginia issued a subpoena relating to the criminal investigation into PurchasePro and its
relationship with AOL.

7.    In or about the fall of 2003, after former PurchasePro officers Jeffrey R. Anderson
and Scott H. Miller entered guilty pleas to felonies in the Eastern District of Virginia relating to
the fraud at PurchasePro, JOHNSON discussed the guilty pleas with his co-conspirators and
repeated his instructions to lie about what happened at PurchasePro in the event any of them
were asked about it by the FBI.

8.    On or about December 12, 2003, at least one of the co-conspirators coached by
JOHNSON did lie to the FBI about one or more subjects material to the FBI's investigation in an
interview conducted in Alexandria, Virginia in the Eastern District of Virginia,.

(All in violation of Title 18, United States Code, Sections 1512(b) and 3551 *et seq.*)

## COUNT TWENTY-NINE

(False Statements –WIEGAND)

THE GRAND JURY FURTHER CHARGES THAT:

1.    On or about July 26, 2002, the Federal Bureau of Investigation ("FBI") commenced a criminal investigation of matters relating to AOL's relationship with its partners, including PurchasePro, involving potential violations of federal criminal laws. The FBI investigation included an examination of PurchasePro's reported revenues in 2000 and 2001, the sales of marketplace licenses and use of secret side deals, and efforts to destroy documents and obstruct investigations.

2.    On or about November 25, 2003, in the Eastern District of Virginia, in a matter within the jurisdiction of the Federal Bureau of Investigation, a branch of the United States Department of Justice an agency of the executive branch of the United States, the defendant, SCOTT E. WIEGAND, knowingly and willfully made a materially false, fictitious and fraudulent statement and representation, in that WIEGAND falsely stated in an interview with the FBI that WIEGAND had told PurchasePro's auditors in or about April 2001 that AOL was strong-arming its customers and reworking IMAs with those customers in conjunction with the customers' purchase of PurchasePro products, when in fact, as he well knew, WIEGAND did not tell PurchasePro's auditors that AOL was strong-arming its customers and reworking IMAs with those customers in conjunction with the customers' purchase of PurchasePro products.

(All in violation of Title 18, United States Code, Section 1001(a)(2) and 3551 *et seq.*)

42

## COUNT THIRTY

(False Statements –WIEGAND)

THE GRAND JURY FURTHER CHARGES THAT:

1.    On or about July 26, 2002, the Federal Bureau of Investigation ("FBI") commenced a criminal investigation of matters relating to AOL's relationship with its partners, including PurchasePro, involving potential violations of federal criminal laws. The FBI investigation included an examination of PurchasePro's reported revenues in 2000 and 2001, the sales of marketplace licenses and use of secret side deals, and efforts to destroy documents and obstruct investigations.

2.    On or about November 25, 2003, in the Eastern District of Virginia, in a matter within the jurisdiction of the Federal Bureau of Investigation, a branch of the United States Department of Justice, an agency of the executive branch of the United States, the defendant, SCOTT E. WIEGAND, knowingly and willfully made a materially false, fictitious and fraudulent statement and representation, in that WIEGAND falsely stated in an interview with the FBI that WIEGAND did not ask anyone within PurchasePro to delete WIEGAND's e-mails, when in fact, as he well knew, WIEGAND did ask a member of PurchasePro's technology department to delete his e-mails.

(All in violation of Title 18, United States Code, Section 1001(a)(2) and 3551 *et seq.*)

## COUNT THIRTY-ONE

### (False Statements –KENNEDY)

THE GRAND JURY FURTHER CHARGES THAT:

1.      On or about July 26, 2002, the Federal Bureau of Investigation ("FBI") commenced a criminal investigation of matters relating to AOL's relationship with its partners, including PurchasePro, involving potential violations of federal criminal laws. The FBI investigation included an examination of PurchasePro's reported revenues in 2000 and 2001, the sales of marketplace licenses and use of secret side deals, and efforts to destroy documents and obstruct investigations.

2.      On or about June 11, 2003, in the Eastern District of Virginia, in a matter within the jurisdiction of the Federal Bureau of Investigation, a branch of the United States Department of Justice an agency of the executive branch of the United States, the defendant, JOSEPH MICHAEL KENNEDY, knowingly and willfully made a materially false, fictitious and fraudulent statement and representation, in that KENNEDY stated in an interview with the FBI that KENNEDY had signed the AuctioNet Statement of Work in the last few days of March 2001 during the first quarter of 2001, when in fact, as he well knew, KENNEDY did not sign the Statement of Work until after the first week of April 2001 after the close of the first quarter of 2001.

(All in violation of Title 18, United States Code, Section 1001(a)(2) and 3551 *et seq.*)

44

## FORFEITURE

1.        If convicted of the conspiracy charged in Count One of this Indictment,

defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section

981(a)(1)(C) and Title 28, United States Code, Section 2461, any property, real or personal,

which constitutes or is derived from proceeds traceable to wire fraud, in violation of Title 18,

United States Code, Section 1343, and securities fraud, in violation of Title 15, United States

Code, Section 78ff, including a sum of money equal to at least $2,300,000.00 in United States

currency, representing the amount of proceeds obtained as a result of the conspiracy charged in

Count One, for which the defendants are jointly and severally liable.

2.        Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title

28, United States Code, Section 2461(c), each defendant shall forfeit substitute property, up to

the value of the amount described, i.e., $2,300,000.00 in United States currency, if, by any act or

omission of the defendant, the $2,300,000.00 in United States currency or any portion thereof,

cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited

with a third party; has been placed beyond the jurisdiction of the Court; has been substantially

diminished in value; or has been commingled with other property which cannot be divided

without difficulty.  The property subject to forfeiture as substitute assets includes, but is not

limited to, the following:

3.        With respect to defendant CHARLES E. JOHNSON, JR., the following property:

a.        a sum of money equal to the amount of proceeds obtained as a result of the

conspiracy, securities fraud and wire fraud offenses, for which the defendants are

jointly and severally liable;

b.        real property known as 8801 Palm Greens Ct., Las Vegas, NV 89134.

4.        With respect to defendant KENT D. WAKEFORD, the following property:

a.        a sum of money equal to the amount of proceeds obtained as a result of the

conspiracy, securities fraud and wire fraud offenses, for which the defendants are

jointly and severally liable;

45

b.      all funds contained in AOL Time Warner IRA Savings Plan maintained at Fidelity, account number 207-298000;

c.      all funds contained in E*Trade Securities LLC account number 1095-4310;

d.      all funds contained in Citibank account number 80452276.

5.      With respect to defendant SCOTT E. WIEGAND, the following property:

a.      a sum of money equal to the amount of proceeds obtained as a result of the conspiracy, securities fraud and wire fraud offenses, for which the defendants are jointly and severally liable;

b.      real property known as 912 Cypress Ridge Lane, Las Vegas, Nevada, 89144;

c.      all funds contained in Vanguard account number 09959204783.

6.      With respect to defendant JOHN P. TULI, the following property:

a.      a sum of money equal to the amount of proceeds obtained as a result of the conspiracy, securities fraud and wire fraud offenses, for which the defendants are jointly and severally liable;

b.      all funds contained in State Street Bank account number 52020777;

c.      all funds contained in State Street Bank account number 52020776;

7.      With respect to defendant JOSEPH MICHAEL KENNEDY, the following property:

a.      a sum of money equal to the amount of proceeds obtained as a result of the conspiracy, securities fraud and wire fraud offenses, for which the defendants are jointly and severally liable;

b.      all funds contained in Merrill Lynch account number 74796457;

c.      all funds contained in Bank of America account number 0049-6137-8699;

d.      all funds contained in Fidelity MML Investors Services Inc. account number BMA531260.

46

8.   With respect to defendant CHRISTOPHER J. BENYO, the following property:

a.   a sum of money equal to the amount of proceeds obtained as a result of the conspiracy, securities fraud and wire fraud offenses, for which the defendants are jointly and severally liable;

b.   real property known as 8 Rubaiyat Ct., Greer, South Carolina 29650;

c.   all funds, contained in Sanford C. Bernstein Co. LLC account number 03751722;

d.   all funds contained in Sanford C. Bernstein Co. LLC account number 03751723;

e.   a 2001 Porsche Boxster bearing VIN WPOCB29841U664470.

(Pursuant to 18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461, and 21 U.S.C. § 853.)

## SENTENCING FACTORS

1.    With respect to each count of the Indictment with which each defendant is charged:

    a.    the loss exceeded $20 million;

    b.    the offense involved more than minimal planning;

    c.    the offense involved a scheme to defraud more than one victim;

    d.    the offense was committed through mass-marketing; and

    e.    the offense involved sophisticated means.

2.    With respect to each count of the Indictment with which each defendant is charged:

    a.    JOHNSON was an organizer and leader of a criminal activity that involved five and more participants and was otherwise extensive;

    b.    WAKEFORD, TULI, BENYO, KENNEDY and WIEGAND were each a manager and supervisor and the criminal activity involved five and more participants and was otherwise extensive;

    c.    JOHNSON, WAKEFORD, TULI, BENYO, KENNEDY and WIEGAND each abused a position of public and private trust and used a special skill in a manner that significantly facilitated the commission and concealment of the offenses; and

    d.    JOHNSON, WAKEFORD, TULI, KENNEDY and WIEGAND willfully obstructed and impeded, and attempted to obstruct and impede, the administration of justice during the course of the investigation and prosecution of the instant offense and the obstructive conduct related to the defendant's offense and any relevant conduct and a closely related offense.

A TRUE BILL

_____
Foreperson
Alexandria, Virginia

Date: _____


PAUL J. MCNULTY
United States Attorney


By: Jack Hanly
Assistant United States Attorney
Supervisor, Fraud Section


Dana J. Boente
Charles F. Connolly
Assistant United States Attorneys


Adam A. Reeves
Trial Attorney, Fraud Section
U.S. Department of Justice, Criminal Division


49

APR 91

*No.*

# UNITED STATES DISTRICT COURT

*Eastern District of Virginia*

*Alexandria Division*

THE UNITED STATES OF AMERICA

*vs.*

Christopher J. Benyo
Charles E. Johnson, Jr.
Joseph Michael Kennedy
John P. Tuli
Kent D. Wakeford
Scott E. Wiegand

## INDICTMENT

Counts 1: 18 U.S.C. § 371 (Conspiracy)
Counts 2-3: 15 U.S.C. § 78j(b) and 78ff; 17 C.F.R., § 240.10b-5
      (Securities Fraud)
Count 4-5: 15 U.S.C. § 78m(b)(1) and 78ff; 17 C.F.R. § 240.13b2-2
      (False Statements to Auditors)
Counts 6-27: 18 U.S.C. § 1343 and 1346 (Wire Fraud)
Count 28: 18 U.S.C. § 1512 (Obstruction)
Count 29-31: 18 U.S.C. § 1001 (False Statements)
Forfeiture Notice 18 U.S.C. § 981
Sentencing Factors 18 U.S.C. §§ 3551 et seq.

*A true bill.*

_____
                                                 *Foreperson*

*Filed in open court this* _____ *day, of* _____ *A.D. 20.* _____

_____

*Clerk*

*Bail, $* _____

_____